IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DANNY K., by and through his    )    Civ. No. 11-00025 ACK-KSC
mother, LUANA K.,               )
                                )
         Plaintiffs,            )
                                )
    v.                          )
                                )
DEPARTMENT OF EDUCATION, STATE  )
OF HAWAI'I,                     )
                                )
         Defendant.             )
_____ )


**ORDER AFFIRMING THE FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
DECISION OF THE OFFICE OF ADMINISTRATIVE HEARINGS**

**BACKGROUND**[1]

This case is a civil action for the review of a
decision of the State of Hawaii's Office of Administrative
Hearings. See Admin. R. Ex. 18 ("Admin. Decision"). Plaintiffs
are Danny K. ("Student") and his mother ("Mother"). Defendant is
the State of Hawaii's Department of Education.[2] The Court has
jurisdiction under 20 U.S.C. § 1415(i) and affirms.

---

[1] The facts as recited in this order are for the purpose of
disposing of this review of the administrative hearings officer's
decision. They are not to be construed as findings of fact that
the parties may rely on in future proceedings.

[2] Plaintiffs filed an opening brief before this Court on
July 1, 2011; Defendant filed an answering brief on August 1,
2011; and Plaintiffs filed a reply brief on August 15, 2011.
Doc. Nos. 23-25.

Student is currently sixteen years old and his public home school is Castle High School. <u>See</u> Admin. R. Resp't's Ex. 5 at DK 25. In January 2010, Student was placed at Queen Lili'uokalani Children's Center ("QLCC"), an alternative learning center, because he had been cutting classes and failing courses at Castle. <u>See</u> Tr. at 10, 28, 297.

Student was identified as eligible for special education and related services under the Individuals with Disabilities Education Act ("IDEA") in March 2010, due to a diagnosis of Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Type ("ADHD"). <u>See</u> Admin. R. Resp't's Ex. 8; <u>Id.</u> Ex. 13 at DK 110.[3] An individualized education program ("IEP") for Student was developed on April 13, 2010. This IEP provided that Student would remain at QLCC through the end of the 2009-10 school year (which was about one month away), and then be placed in a therapeutic resource room at Castle. <u>Id.</u> Ex. 5 at DK 38; Tr. at 149-50.

In May 2010, however, Student set off a firework/bomb in the boys' bathroom at Castle, causing extensive damage. <u>See</u>

---

[3] Student has also been diagnosed with Conduct Disorder, Adolescent-Onset Type. Admin. R. Resp't's Ex. 13 at DK 107, 110. Defendant's position, which Plaintiffs have not challenged, is that Student's Conduct Disorder is not an eligible disability under the IDEA; and accordingly, the matter of Conduct Disorder eligibility under the IDEA is not at issue in this appeal. <u>See</u> Tr. at 146, 301-03; 349-50; Answering Br. at 7.

Tr. at 238-46; Admin. R. Resp't's Ex. 16; Id. Ex. 17 at DK 138.[4/]
Following Student's admission of guilt, Castle vice principal
Chris Bisho notified Plaintiffs that Student would be suspended
from school for one year.  See Admin. R. Resp't's Ex. 17 at DK
138.  Defendant then held a manifestation determination review
and found that Student's April IEP was appropriate and that
Student's misconduct was not a manifestation of his ADHD.  See
Id. Ex. 17 at DK 139.

In early August 2010, Defendant approved Bisho's
recommendation that Student receive a disciplinary transfer
instead of being suspended for a year.  See Tr. at 249-52; Admin.
R. Resp't's Ex. 17 at DK 149.  Defendant held an IEP meeting on
August 4, 2010, and offered Student a placement for the 2010-11
school year at Olomana School, an alternative learning center.
See Tr. at 252-54; Admin. R. Resp't's Ex. 6 at DK 55 ("Aug.
IEP").  An IEP revision meeting was scheduled for August 13,
2010, but cancelled when Plaintiffs on the same day requested an
impartial due process hearing.  See Tr. at 342-43; Admin. R. Ex.
1 at 1.

In a due process hearing before the Office of
Administrative Hearings, Plaintiffs claimed, inter alia, that
prior to Student's June 2010 suspension, Defendant failed to

---

[4/] The parties refer to the device set off in the Castle
bathroom as a firework and as a bomb.  For ease of reference, the
Court will call the device a firework.

offer an appropriate program and placement and to adequately evaluate Student's needs, and that thereafter, Defendant failed to conduct an appropriate manifestation determination review. See Admin R. Exs. 1, 10, 17; Admin. Decision at 9. The administrative hearings officer dismissed each of Plaintiffs' claims. See Admin. Decision at 10-16.[5]

The factual background of this case is set forth in greater detail in the hearings officer's decision. See Admin. Decision at 3-9. Plaintiffs challenge some of the officer's factual findings, and the Court addresses those findings in the discussion below. Otherwise, the Court adopts the officer's factual findings to the extent that they are relevant to this case. The Court will further describe the pertinent details of the IEPs and related documents, placements, and evaluations in the discussion below.[6]

_____

[5] Plaintiffs also claimed at the due process hearing that Defendant "failed to conduct a functional behavioral assessment ('FBA') or develop an appropriate [behavioral support plan]"; "[t]hat Student was suspended for more than one year in violation of the IDEA which limits suspensions to 45 days"; and that "upon suspension [Defendant] failed to provide Student appropriate educational services to meet his needs." Admin. Decision at 9. But Plaintiffs have not pressed these issues in the instant appeal.

[6] Student began attending Olomana School in the fall of 2010. See Tr. at 24-26. At the hearing, Plaintiffs' counsel further informed the Court that in June 2011, Student began attending the Hawaii National Guard Youth Challenge Academy on the Big Island of Hawai'i. Apparently, Student has done quite well in this program, and he hopes to obtain a high school
(continued...)

## STANDARD

In evaluating an appeal of an administrative decision under the IDEA, a court "(I) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."[7/]   20 U.S.C. § 1415(i)(2)(C).[8/]

The statutory requirement "that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982).  Rather, "due weight" must be given to the findings in the administrative proceedings.  Id.

The amount of deference given to administrative findings in this context is a matter of judicial discretion.  See Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995) (quoting Gregory K. v. Longview Sch. Dist., 811

---

[6/](...continued)
diploma or GED this December and ultimately attend college.

[7/] No party has requested that the Court hear additional evidence in this action.

[8/] An amendment to the IDEA, effective July 1, 2005, affected the subsection number at which this provision appears in the statute but did not affect the text of the provision. Compare 20 U.S.C. § 1415(i)(2)(B) (in effect prior to July 1, 2005) with 20 U.S.C. § 1415(i)(2)(C) (effective July 1, 2005).

F.2d 1307, 1311 (9th Cir. 1987)).  A court must "consider the findings 'carefully and endeavor to respond to the hearing officer's resolution of each material issue,' but 'is free to accept or reject the findings in part or in whole.'"  Id. (quoting Gregory K., 811 F.2d at 1311).  "When exercising its discretion to determine what weight to give the hearing officer's findings," a court may "examine the thoroughness of those findings" and accord greater deference when they are "'thorough and careful.'"  Id. (quoting Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994)).

A court's inquiry in reviewing administrative decisions under the IDEA is twofold:  "First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."  Rowley, 458 U.S. at 206-207 (footnotes omitted); see also Smith, 15 F.3d at 1524.

Alternatively stated, the IDEA requires that individuals with disabilities be offered a free appropriate public education ("FAPE") that emphasizes special education, is designed to meet the unique needs of the Student, and will prepare the Student for further education, independent living and

employment.  20 U.S.C. § 1400(d)(1).  An education is appropriate

if it "(1) addresses [the student's] unique needs; (2) provides

adequate support services so [the student] can take advantage of

the educational opportunities; and (3) is in accord with the

individualized education program."  Capistrano, 59 F.3d at 884,

893; see also Rowley, 458 U.S. at 188-89.  The Ninth Circuit has

recently affirmed that "[t]he proper standard to determine

whether a child has received a free appropriate public education

is the 'educational benefit' standard set forth by the Supreme

Court in Rowley," and further noted that

> [s]ome confusion exists in this circuit regarding
> whether the Individuals with Disabilities Education Act
> requires school districts to provide disabled students
> with "educational benefit," "some educational benefit"
> or a "meaningful" educational benefit."  As we read the
> Supreme Court's decision in Rowley, all three phrases
> refer to the same standard.  School districts must, to
> "make such access meaningful," confer at least "some
> educational benefit" on disabled students.  For ease of
> discussion, we refer to this standard as the
> "educational benefit" standard.

J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 951 n.10 (9th

Cir. 2010) (internal citations omitted).

In looking at the educational benefit, the Court looks

broadly at the Students academic, social, health, emotional

communicative, physical, and vocational needs.  Seattle Sch.

Dist., No. 1 v. B.S., 82 F.3d 1493, 1498 (9th Cir. 1996).  An

appropriate education "does not mean the absolutely best or

'potential-maximizing' education for the individual child."

7

<u>Gregory K.</u>, 811 F.2d at 1314.  Rather, the state must only

provide "a basic floor of opportunity" for the student.  <u>Id.</u>

Furthermore, although a family's preferred schooling may be more

beneficial for the student than the DOE's proposed placement,

this alone does not make the DOE's placement inappropriate.

<u>Gregory K.</u>, 811 F.2d at 1314.  "'[A] school district fulfills its

substantive obligations under the IDEA if it provides an IEP that

is likely to produce progress, not regression, and if the IEP

affords the student with an opportunity greater than mere trivial

advancement.'"  <u>T.P. v. Mamaroneck Union Free Sch. Dist.</u>, 554

F.3d 247, 254 (2d Cir. 2009) (citation omitted); <u>N.S. v. Hawaii</u>,

Civ. No. 09-00343 SOM-KSC, 2010 WL 2348664, at *4 (D. Haw. June

9, 2010).

The party challenging the administrative decision in an

IDEA case has the burden of proof before the District Court.

<u>Seattle Sch. Dist.</u>, 82 F.3d at 1498.[9/]

### DISCUSSION

This case concerns the substance of Student's April

IEP, the adequacy of Defendant's evaluation of Student's needs

prior to his suspension, and the propriety of Defendant's

manifestation determination review.  The Court will address the

---

[9/] Similarly, the burden of proof in an administrative
hearing challenging an IEP is placed upon the party seeking
relief.  <u>Schaffer v. Weast</u>, 546 U.S. 49, 62 (2005).

issues raised by Plaintiffs in roughly the order presented in their briefs.[10/]

**I.      Whether the Administrative Decision Is Entitled to Deference**

Plaintiffs argue that the administrative decision is not entitled to deference because it "lacks discrete analysis of the law and explanation of the legal conclusions," cites only one case, and "gives short shrift to the evidence in the record before abruptly stating [its] conclusions."  Opening Br. at 9-10. Plaintiffs also contend that the administrative hearings officer clearly erred in disregarding the testimony of Barbara Bateman, Plaintiffs' expert.  Id. at 10.  The Court is not persuaded.

In IDEA cases, courts "give 'due weight' to the state administrative proceedings."  J.G. v. Douglas County Sch. Dist., 552 F.3d 786, 793 (9th Cir. 2008).  The "fact-intensive nature" of IDEA proceedings "'coupled with considerations of judicial

---

[10/] In its answering brief, Defendant argues that "the hearings officer correctly determined that [Plaintiffs] failed to meet their burden of proving that [Defendant's] suspension of Student violated the IDEA, and that upon suspension, [Defendant] did not provide Student appropriate educational services." Answering Br. at 22-24.  As the Court stated supra Note 5, however, Plaintiffs have not challenged these particular findings by the hearings officer (apart from contesting the propriety of Defendant's manifestation determination review).  Although the adequacy of the August IEP is not at issue on appeal, as Plaintiffs acknowledged at the hearing, the Court notes that Plaintiffs' request for a due process hearing on August 13, 2010, apparently preempted an IEP revision meeting that was scheduled to occur that day.  This meeting would have included staff from both Castle and Olomana School.  See Tr. at 342-43; Admin. R. Ex. 1 at 1; Admin. Decision at 9.

economy render a more deferential approach appropriate.'"  <u>See</u>
<u>id.</u> (citation omitted).  In particular, a court "'must give
deference to the state hearing officer's findings, particularly
when they are thorough and careful,' and avoid 'substituting its
own notions of sound educational policy for those of the school
authorities which it reviews.'"  <u>Ashland Sch. Dist. v. Parents of</u>
<u>Student R.J.</u>, 588 F.3d 1004, 1008-09 (9th Cir. 2009) (internal
citations and alterations omitted).  Courts "treat a hearing
officer's findings as 'thorough and careful' when the officer
participates in the questioning of witnesses and writes a
decision 'containing a complete factual background as well as a
discrete analysis supporting the ultimate conclusions.'"  <u>R.B. v.</u>
<u>Napa Valley Unified Sch. Dist.</u>, 496 F.3d 932, 942 (9th Cir.
2007).  Moreover, "[t]his circuit gives the state hearing
officer's decision 'substantial weight' when it 'evinces his
careful, impartial consideration of all the evidence and
demonstrates his sensitivity to the complexity of the issues
presented.'"  <u>County of San Diego v. Cal. Spec. Educ. Hearing</u>
<u>Office</u>, 93 F.3d 1458, 1466-67 (9th Cir. 1996) (citation omitted).

Here, the hearings officer's sixteen-page decision,
which was rendered after two days of hearings, contains a
detailed factual background and analysis.  Contrary to
Plaintiffs' contention, the officer explains most of his legal
conclusions and cites specific facts supporting those

10

conclusions.  See J.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 441 (9th Cir. 2010); cf. Marc M. v. Dep't of Educ., Hawaii, 762 F. Supp. 2d 1235, 1242 (D. Haw. 2011); C.P. v. Hawaii, Civ. No. 09-00393 DAE-BMK, 2010 WL 1962944 at *8 n.7 (D. Haw. May 17, 2010); Opening Br. at 8-9.[11/]

Also, Plaintiffs fail to show that the hearings officer clearly erred in discounting Bateman's testimony on the ground that Bateman reviewed Student's records only, and did not personally evaluate him.  See Opening Br. at 10.  In Melodee H. v. Department of Education, Hawaii, Civ. No. 07-000256 HG-LEK, 2008 WL 2051757 (D. Haw. May 13, 2008), the court found that a hearings officer clearly erred in disregarding expert testimony about the propriety of a student's placement where the defendant did not cross-examine the expert and provided only one witness who "did not know [the student], had never taught him, had never met him, and had never assessed him."  Id. at *10-11.  Here, by contrast, Defendant cross-examined Bateman and offered the testimony of James Jackson, a behavioral health specialist who knew, worked with, and personally assessed Student.  The hearings officer did not clearly err in affording Jackson's testimony greater weight than Bateman's.  And to the extent that this

---

[11/] As the Court explains infra Part III, the hearings officer does not explain his conclusion that Defendant adequately evaluated Student's needs prior to Student's suspension. Accordingly, the Court does not give deference to this particular legal conclusion.

weighing of the evidence involved witness credibility, the Court gives particular deference to the hearings officer, "who receive[d] live testimony [and was] in the best position to determine issues of credibility." See Amanda J. v. Clark County Sch. Dist., 267 F.3d 877, 889 (9th Cir. 2001); Answering Br. at 11-12 (noting that Bateman testified telephonically, while Jackson testified in person).

In short, except as explained infra Part III, the Court agrees with Defendant that the administrative decision "shows that the [officer] carefully weighed and considered the evidence and prepared a well-reasoned and thoughtful decision." Answering Br. at 11. Accordingly, the Court gives due weight to the administrative decision, and affords it particular deference to the extent that it is "thorough and careful." The Court will "summarily dismiss" any "impermissible attempts to second-guess the [hearings officer's] characterization and weighing of the evidence." R.B., 496 F.3d at 942.

II.        **Whether the April IEP Provided Student with a FAPE**

Plaintiffs argue that the April IEP did not provide Student with an appropriate program or placement. See Opening Br. at 13-20; Reply at 3-11. Plaintiffs claim that "nothing changed educationally for Danny either before or after the IEP was drafted," and that the April IEP did not adequately address Student's unique educational needs. See id. at 13, 20-25. The

Court is not convinced, and finds that the April IEP was "developed through the [IDEA's] procedures [and was] reasonably calculated to enable [Student] to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982).[12/]

In January 2010, Student was placed at QLCC because he had been cutting classes and failing courses at Castle. See Admin. Decision at 3; Tr. at 10, 28, 297. An emotional behavioral assessment conducted in March 2010 found that Student's difficulties in school stemmed in large part from his poor attendance and work habits, lack of motivation, and disruptive behaviors. See Admin. Decision at 3; Admin. R. Resp't's Ex. 13 at DK 108.[13/] The emotional behavioral assessment recommended, inter alia, that Student receive counseling at school "to help [him] to learn how to behaviorally and otherwise cope effectively with his symptoms/difficulties"; that Student take frequent short breaks in school; and that Student's tasks be broken down into smaller steps or chunks. See Admin. Decision at 4; Admin. R. Resp't's Ex. 13 at DK 110-11.

---

[12/] Aside from arguing that Defendant failed to adequately evaluate Student in all areas of suspected disability, which the Court discusses infra Part III, Plaintiffs do not challenge the April IEP on procedural grounds.

[13/] The emotional behavioral assessment also outlined Student's extensive history of misconduct, both in and out of school. See Admin. R. Resp't's Ex. 13 at DK 93, 99-100, 107.

An IEP meeting was held on April 13, 2010, and it included the following participants: Student, Mother, a special education transition teacher, a behavioral health specialist, an administration designee, a parent consultant, and Student's teacher from QLCC. See Admin. R. Resp't's Ex. 5 at DK 40-41; Id. Ex. 15 at DK 114. The April IEP provided that Student would "receive special education services for a total of 120 minutes daily from 04/13/2010 to 05/25/2010" at QLCC. Id. Ex. 5 at DK 38; see Tr. at 150-51. During this time, Student would "participate with his non-disabled peers in the general education setting off campus for his advisory class totaling 39 minutes once a week." Admin. R. Resp't's Ex. 5 at DK 39.

The April IEP further provided that from 05/25/2010 to 04/13/2011, Student would "receive special education services for a total of 276 minutes daily" in a therapeutic resource room at Castle. Id. Ex. 5 at DK 38; see Tr. at 150-51. During this time, Student would "participate with his non-disabled peers in the general education setting for lunch, recess and assemblies." Admin. R. Resp't's Ex. 5 at DK 39. The IEP team had considered sending Student back to Castle immediately, but decided it would be best for him to instead finish the year at QLCC. This would allow him to earn as many credits as possible to advance to the 10th grade, as there was only about one month remaining in the school year. See Id. Ex. 8 at DK 63; Tr. at 150.

14

The April IEP included a number of language arts and math goals, as well as various program modifications and supports.  See Admin. R. Resp't's Ex. 5 at DK 33-38.  It also provided that Student would receive counseling for 150 minutes per quarter from April 2010 through April 2011.  Id. at DK 38.  James Jackson, the behavioral health specialist who provided this counseling to Student, developed a behavior support plan for Student on April 20, 2010.  See id. Ex. 4; Tr. at 305-07.

Based on the foregoing and the Court's review of the record, the Court agrees with the administrative hearings officer that Plaintiffs fail to show, by a preponderance of the evidence, that the April IEP was not reasonably calculated to provide Student with "some educational benefit."  See Rowley, 458 U.S. at 200; J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 947, 951 & n.10 (9th Cir. 2010).

As the officer emphasized, the April IEP's language arts and math goals were broken down, or "chunked".  See Admin. Decision at 11; Admin. R. Resp't's Ex. 5 at DK 33-38.  This followed the emotional behavioral assessment's recommendations and "addresse[d] Student's focusing, organizational, and inattentiveness issues."  See Admin. R. Resp't's Ex. 13 at DK 93, 97-98, 111; Admin. Decision at 11.[14/]  The April IEP also provided

---

[14/] The Court further agrees with the hearings officer that addressing Student's "focusing, organizational, and

(continued...)

for counseling services, as recommended by the emotional behavioral assessment. See Admin. R. Resp't's Ex. 5 at DK 38; Id. Ex. 13 at DK 110. Similarly, Student's behavioral support plan provided for chunking of assignments and short breaks, interventions that were also recommended by the emotional behavioral assessment. See Admin. Decision at 11; Admin. R. Resp't's Ex. 4; Id. Ex. 13 at DK 93, 97, 110-11. The behavioral support plan was primarily aimed at refocusing Student and monitoring and improving his attendance. See Admin. R. Resp't's Ex. 4; Tr. at 305-08, 318-19; Admin. Decision at 11 (noting that the behavioral support plan "would address Student's needs" and "provided interventions to refocus Student and monitor his attendance"). Student's inattentiveness and poor attendance had been identified as the main causes of his difficulties in school. See Admin. R. Resp't's Ex. 13 at DK 108-09.

None of Plaintiffs' arguments persuade the Court that the April IEP failed to meet the substantive requirements of the IDEA. To begin with, even assuming (but not agreeing) that the April IEP did not include behavioral goals and lacked a variety of other services that would have benefitted Student, as Plaintiffs contend, an appropriate education "does not mean the

[14]/(...continued)
inattentiveness issues" through the chunking of assignments would also have the supplemental benefit of "help[ing to] reduce [Student's] behavioral and anger issues." See Admin. Decision at 11; Admin. R. Resp't's Ex. 13 at DK 93, 97-98, 111.

absolutely best or 'potential-maximizing' education for the
individual child." See Gregory K. v. Longview Sch. Dist., 811
F.2d 1307, 1314 (9th Cir. 1987); Opening Br. at 20-25; Reply at
5-9.  Instead, the state must only provide "a basic floor of
opportunity" for the student.  See Gregory K., 811 F.2d at 1314.
In light of the IEP provisions discussed above, the Court finds
that the April IEP provided Student with an appropriate floor of
opportunity.

Plaintiffs' complaints about the April IEP and
Student's continued placement at QLCC also ignore that the April
IEP's program and placements were consistent with Plaintiffs'
stated objectives and recommendations, and were indeed unobjected
to by Mother at the time the IEP was developed.  See Tracy N. v.
Dep't of Educ, Hawaii, 715 F. Supp. 2d 1093, 1112-13 (D. Haw.
2010) ("[A]lthough Mother may now be complaining that she didn't
really want to agree to these placements, she did agree to the
2006-07 and 2007-08 placements at the time they were made.
[Moreover], Student's case required educators and other team
professionals to make some difficult balancing decisions in
determining Student's placement. . . . These are not decisions
this Court will lightly second-guess based upon hindsight.");
Opening Br. at 13-25; Reply at 3-4.

In particular, Mother testified that at the time the
IEP was developed, the goal was for Student to graduate with his

class at Castle.  See Tr. at 111 ("[T]he goal was to get
[Student] to graduate with his class.  He wanted to graduate with
his class.").  It was with this goal in mind, and Mother's
approval, that the IEP team decided Student would remain at QLCC
for the final four weeks or so of the 2009-10 school year.  See
Admin. R. Resp't's Ex. 8 at DK 63 (noting that the IEP team
decided Student would remain at QLCC for the duration of the
school year because it "would provide him the opportunity to earn
as many credits possible to advance him to the 10th grade
class"); Tr. at 103, 150, 287; Answering Br. at 14.  Although the
Court agrees with Plaintiffs that QLCC was a restrictive
environment, the Court finds that Student's continued placement
at QLCC for a short period of time at the end of the school year
satisfied the IDEA's "least restrictive environment" requirement.
This placement, which was supplemented by 39 minutes a week of
participation in an advisory class with non-disabled peers,
mainstreamed Student "to the maximum extent appropriate."  See 20
U.S.C. § 1412(a)(5)(B) (emphasis added); J.W. v. Fresno Unified
Sch. Dist., 626 F.3d 431, 448 (9th Cir. 2010); cf. Opening Br. at
17-20.

Moreover, Student had been doing poorly in his general
education classes at Castle and had negatively affected the
teachers and other children there, as the administrative hearings
officer noted.  See Admin. Decision at 11; see, e.g., Admin. R.

Resp't's Ex. 13 at DK 92.[15/]  These are important considerations

in the balancing test set forth in <u>Sacramento City Unified School

District v. Rachel H.</u>, 14 F.3d 1398 (9th Cir. 1994).  <u>See</u> <u>C.P. v.

Hawaii</u>, Civ. No. 09-00393 DAE-BMK, 2010 WL 1962944 at *7-9 (D.

Haw. May 17, 2010) ("[I]t is acknowledged that Student would

benefit from integration with his peers, but the effect Student

had on the teachers and other students in the regular class was

highly problematic. . . . The fact that Student was isolated from

his peers is not, itself, indicative that he was not provided

with the [least restrictive environment].").  And as Defendant

further points out, it was reasonable for Defendant to maintain

Student's placement at QLCC - at least for the duration of the

school year - because Student had been doing significantly better

there than he had been doing at Castle.  Answering Br. at 14.

According to behavioral health specialist Jackson, Student was

more successful at QLCC because of its smaller classes and

greater degree of individualized attention.  <u>See</u> Tr. at 306-08;

<u>see also</u> Admin. R. Resp't's Ex. 12; <u>Id.</u> Ex. 13 at DK 101.

Student's attendance was also "improving greatly" at QLCC, and he

---

[15/] In particular, the hearings officer noted that Student
was initially placed at QLCC because "he had been cutting classes
and was not doing well at the home school.  Student had also been
arrested for burglary, property damage and other charges;
shoplifting and theft.  Student also engaged in dangerous
conduct, dangling a stick from an overpass in front of on-coming
traffic."  Admin. Decision at 11.

had a good relationship with the teacher there.  See Tr. at

307.[16/]

        Mother also testified that she had told the IEP team

that it was important for Student to have breaks.  See Tr. at

110.  And Mother testified that she believed that a counselor and

a behavioral support plan could help Student with his

organizational difficulties.  See Tr. at 110-12.  Consistent with

Mother's statement to the IEP team and her beliefs about what

could assist Student, the April IEP provided for breaks and

counseling, and a behavioral support plan was developed a week

after the April IEP meeting.  See Admin. R. Resp't's Ex. 5 at DK

55; Id. Ex. 4.  And pursuant to the April IEP, which was

implemented under the supervision of care coordinator Dale

Kashiwamura, Student indeed received counseling services from

behavioral health specialist Jackson.  See Tr. at 289, 319-21

(Jackson's testimony that between April 13 and May 20, 2010, he

_____

        [16/] To show that Student "was not receiving an educational
benefit nor a special education program" at QLCC, Plaintiffs cite
Students' testimony about QLCC and the emotional behavioral
assessment's statement that Student became "discouraged in his
ability to use the NovaNet computer learning system at QLCC."
See Opening Br. at 14; see also Reply at 10.  The hearings
officer did not find Student entirely credible, however, so the
Court gives Student's testimony limited weight.  See Admin.
Decision at 6; Amanda J. v. Clark County Sch. Dist., 267 F.3d
877, 889 (9th Cir. 2001).  More importantly, Plaintiffs ignore
evidence of Student's relative success at QLCC, including
evidence contained in the emotional behavioral assessment itself.
See Admin. R. Resp't's Ex. 12; Id. Ex. 13 at DK 101; Tr. at 306-
08.

provided Student about three hours of individual counseling);
Answering Br. at 15. Accordingly, the Court is not convinced by
Plaintiffs' contention that the April IEP was not reasonably
calculated to provide Student an educational benefit.[17]

Likewise, the Court is not persuaded by Plaintiffs'
challenge to finding of fact 50 of the administrative decision.
Opening Br. at 21; see Admin. Decision at 9 (concluding that
because Mother refused the Department of Health services offered
at the August IEP meeting, "an appropriate educational program
could not be developed"). That finding relates to the adequacy
of the August IEP, which is not at issue in this appeal.[18] Nor

_____

[17] In their reply brief, Plaintiffs argue for the first time
that Defendant violated Section 504 of the Rehabilitation Act of
1973, 29 U.S.C. § 794, by failing to conduct a placement
evaluation prior to transferring Student to QLCC in January 2010.
See Reply at 14-15. The Court need not consider this argument.
"Any argument raised for the first time in the reply shall be
disregarded." LR7.4; see also Graves v. Arpaio, 623 F.3d 1043,
1048 (9th Cir. 2010) ("[A]rguments raised for the first time in a
reply brief are waived."). Moreover, Plaintiffs did not assert
this argument before the hearings officer, as Plaintiffs
essentially acknowledged at the hearing, so it is not properly
exhausted. See Admin R. Exs. 1, 11, 17; Robb v. Bethel Sch.
Dist. # 403, 308 F.3d 1047, 1048 (9th Cir. 2002); Marc M. v.
Dep't of Educ., Hawaii, 762 F. Supp. 2d 1235, 1241 (D. Haw. 2011)
("[A]rguments not raised in front of a hearings officer cannot be
raised for the first time on appeal to the district court.").

[18] To the extent that Plaintiffs suggest that the Department
of Health services were deficient because they were "family-
oriented," the Court notes that the emotional behavioral
assessment specifically recommended that Student's family
consider receiving Department of Health services to support them
in addressing Student's behavioral problems. See Admin. R.
Resp't's Ex. 13 at DK 110; Opening Br. at 21.

is the Court persuaded by Plaintiffs' claim that the IEP team did not consider the findings and recommendations provided by the emotional behavioral assessment. Opening Br. at 22-23; Reply at 7, 9-10. As discussed above, the April IEP incorporated several of that assessment's recommendations. Further, behavioral health specialist Jackson testified that less than one month before the April IEP was developed, the author of the emotional behavioral assessment spent about "two-and-a-half hours to explain to [Jackson and to] the entire team that was gathered [at the March Student Support Team meeting] everything in the report, every single page." Tr. at 308. Apparently, at least some members of the IEP team were well-acquainted with the contents of the emotional behavioral assessment. And again, that the April IEP did not incorporate as many of the emotional behavioral assessment's recommendations as Plaintiffs would have liked does not mean that the April IEP failed to offer a FAPE.

Finally, as a general matter, the Court rejects Plaintiffs' attempts to have the Court substitute its judgment on educational policy for the judgment of the school authorities who developed Student's IEP. See Rowley, 458 U.S. at 206 (explaining that Congress did not "invit[e] . . . the courts to substitute their own notions of sound educational policy for those of the school authorities which they review"); see, e.g., Opening Br. at 13-14, 19-20 (arguing that QLCC's environment, class duration,

and computer-based learning system prevented Student from receiving a FAPE); Id. at 20 (challenging the behavioral health specialist's interest in having Student participate in the development of Student's own behavioral goals); Reply at 3-4, 6.

In sum, the Court finds that Plaintiffs have not met their burden of showing that the April IEP failed to offer Student a FAPE.

## III.    Whether Defendant Adequately Evaluated Student's Needs Prior to the Suspension

Plaintiffs argue that prior to Student's June 2010 suspension, Defendant failed to adequately evaluate Student in all areas of suspected disability. See Opening Br. at 15-16, 25-31; Reply at 12-15. In particular, Plaintiffs contend that Student's reading assessments reached variable and inconclusive results, and that Student should have been, but was not, tested regarding his head injuries and eye problems. The Court is unpersuaded, and finds that Defendant complied with the procedures of the IDEA in evaluating Student. See Park v. Anaheim Union High Sch. Dist., 464 F.3d 1025, 1031-33 (9th Cir. 2006); J.S. v. Dep't of Educ., Hawaii, Civ. No. 10-00022 DAE-LEK, 2010 WL 3384911, at *6 (D. Haw. Aug. 19, 2010) ("A school district's failure to assess in all areas of suspected disability may constitute a procedural denial of a FAPE.").

In <u>N.B. v. Hellgate</u>, 541 F.3d 1202 (9th Cir. 2008), the
Ninth Circuit addressed the IDEA's provisions regarding
evaluations as follows:

> A child must be tested in all areas of suspected
> disability. 20 U.S.C. § 1414(b). The evaluation
> includes gathering information "that may assist in
> determining . . . the content of the child's
> individualized education program, including information
> related to enabling the child to be involved in and
> progress in the general curriculum, or, for preschool
> children, to participate in appropriate activities."
> 20 U.S.C. § 1414(b)(2)(A)(1998). The "local
> educational agency shall administer such tests and
> other evaluation materials as may be needed to produce
> the data identified by the IEP Team" in order to
> determine the needs of the child. <u>Id.</u> § 1414(c)(2).
> "Each local educational agency shall ensure that - (B)
> any standardized tests that are given to the child -
> . . . (ii) are administered by trained and
> knowledgeable personnel." <u>Id.</u> § 1414(b)(3)(B)(ii)
> (1998). In conducting or obtaining an evaluation, the
> school district "shall ensure that the child is
> assessed in all areas of suspected disability." <u>Id.</u>
> § 1414(b)(3)(C)(1997); 34 C.F.R. § 300.532(g)(1999).

<u>Id.</u> at 1208-09.

Here, the hearings officer concluded that Plaintiffs
did not show "that prior to Student's June 8, 2010 suspension,
the DOE failed to adequately evaluate Student's academic,
behavioral, psychological and other needs." Admin. Decision at
12. However, the officer did not cite the factual support for
this conclusion or discuss Plaintiffs' arguments that Defendant
failed to adequately evaluate Student. <u>See id.</u> Accordingly, the
Court does not give deference to the officer's legal conclusion
as to evaluations. The Court addresses Plaintiffs' arguments

regarding evaluations in roughly the order presented in their briefs.

First, Plaintiffs challenge Student's reading evaluations. According to Plaintiffs, Student's reading comprehension was never "conclusively evaluated" because one of the test scores listed in Student's Present Levels of Performance ("PLEP") placed him at a 3.4 grade level while another score placed him at a 6th grade level. Opening Br. at 15-16, 25-27; Reply at 12-13. To support their position, Plaintiffs cite their educational expert's testimony that the discrepancy between these test scores was "too large to ignore." Opening Br. at 26. Plaintiffs' argument is unpersuasive because Defendant did not ignore this discrepancy or arbitrarily forgo further standardized testing. To the contrary, Defendant recognized Student's variable standardized test results and relied instead on the assessment of Student's teacher, who personally knew and observed Student, in evaluating Student's reading ability and developing his goals and objectives. See Admin. R. Resp't's Ex. 5 at DK 28; Answering Br. at 15-16. Plaintiffs have not demonstrated that this manner of assessing Student's reading ability violated the IDEA. See 34 C.F.R. §§ 300.301-06 (setting forth the procedures for evaluations and reevaluations).

Second, Plaintiffs argue that Defendant "failed to do evaluations in all areas of suspected disability." Opening Br.

at 27. Plaintiffs point out that although "[t]he PLEP identifies
that [Student] has reported 3 head injuries where he 'blacked
out,'" Defendant "did not perform any follow up neurological
evaluations." Id. The Court is not persuaded that Defendant was
obligated to perform neurological evaluations as a result of
Student's reported football injuries. See Admin. R. Resp't's Ex.
5 at DK 28 (noting that Student blacked out from his football
injuries, but "did not report headaches, dizziness or vomiting");
Id. Ex. 13 at DK 93 (same). The reported injuries did not place
Defendant on sufficient notice that Student suffered from some
form of disability. See 20 U.S.C. § 1414(b) (requiring students
to be "assessed in all areas of suspected disability"); cf. N.B.
v. Hellgate, 541 F.3d 1202, 1208-09 (9th Cir. 2008) (finding that
an IEP team was on notice that a student likely suffered from
some form of autism because the team had been provided with an
evaluation stating that there was an "autistic component" to the
student's poor performance); Tracy N. v. Dep't of Educ, Hawaii,
715 F. Supp. 2d 1093, 1112-13 (D. Haw. 2010) ("The CFR does not
mandate that the DOE send every student to every specialist
possible in order to rule out every potential diagnosis that
could theoretically affect students especially if there are no
indications students are suffering from a disorder.").

Moreover, the Court agrees with Defendant that Mother's
testimony shows that the head injury concern was never as

26

significant as now claimed. Answering Br. at 16. Mother testified that although she took Student to the doctor for his head injury in 2009, "they did not find anything," Student "was okay medically," and Mother "w[asn't] concerned about it." See Tr. at 107-09. And as Defendant further argues, Plaintiffs have not established any causal relationship between Student's head injuries and his academic problems. Answering Br. at 16-17.

Third, Plaintiffs argue that Defendant failed to evaluate Student regarding his eye problems. See Opening Br. at 27, 30; Reply at 13-14. Plaintiffs note that although Defendant's Confidential Intellectual Assessment indicates that Student "stated that his eyes 'vibrated' if he read very much" and "said he did not read on his own partly because of this problem," Defendant did not conduct any visual examinations of student. See Opening Br. at 27; Admin. R. Pet'rs' Ex. 9 at 78. As with Student's head injuries, the Court is not persuaded that Defendant was obligated to perform a visual examination as a result of the Confidential Intellectual Assessment. See Admin. R. Pet'rs' Ex. 9 at 74, 78. Student's reported eye problems did not place Defendant on sufficient notice that Student suffered from some form of disability. See 20 U.S.C. § 1414(b); cf. Hellgate, 541 F.3d at 1208-09; Tracy N., 715 F. Supp. at 1112-13. Like Student's head injury, Plaintiffs now appear to exaggerate the severity of Student's eye problems. See Answering Br. at 16.

Mother testified that she took Student to the eye doctor at some point during or after 2009, and the doctor found nothing and recommended no course of treatment. <u>See</u> Tr. at 109-10. And more importantly, Plaintiffs "have not established that [Student's eye problems] were ever brought to the attention of the IEP team, nor have they established any causal relationship to Student's academic problems." Answering Br. at 16-17.

In sum, the Court finds that Plaintiffs have not shown that Defendant failed to adequately evaluate Student in all areas of suspected disability.

**IV.      Whether Defendant Conducted an Appropriate Manifestation Determination Review**

Plaintiffs argue that Defendant failed to conduct an appropriate manifestation determination review. <u>See</u> Opening Br. at 31-37; Reply at 15-19. Plaintiffs contend that had Defendant "conducted even a cursory" manifestation determination review, by reviewing the April IEP and reviewing the emotional behavioral assessment, "it would have been apparent that (1) [Student] did not have an appropriate IEP provided as required, (2) [Student] did not have an appropriate IEP that was implemented by [Defendant,] and (3) [Student] taking responsibility for something he did not do was a symptom of his disability." <u>Id.</u> at 33. The Court is not convinced, and finds that Defendant's manifestation determination review complied with the procedures of the IDEA. <u>See Fitzgerald v. Fairfax Cnty. Sch. Bd.</u>, 556 F.

Supp. 2d 543, 552-61 (E.D. Va. 2008) (concluding that a school board's manifestation determination review did not violate the IDEA's procedures).

In School Board of the City of Norfolk v. Brown, 769 F. Supp. 2d 928 (E.D. Va. 2010), the court described the IDEA's provisions regarding manifestation determination reviews as follows:

> Pursuant to the IDEA, school personnel may remove a disabled student who has violated a code of conduct from his current educational setting under limited circumstances. Where school personnel intend to place the disabled child in an alternative educational setting for a period of more than ten school days, the school must first determine that the student's behavior was not a manifestation of his disability. See 20 U.S.C. § 1415(k)(1)(C). In conducting this inquiry, within ten days of any decision to change the student's placement, the local educational agency, the parent, and relevant members of the student['s] IEP team (collectively, the "MDR team") shall "review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine — (I) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or (II) if the conduct in question was the direct result of the local educational agency's failure to implement the IEP." § 1415(k)(1)(E)(i). Where the MDR team answers either of the above inquiries in the affirmative, the student's conduct shall be determined to be a manifestation of his or her disability and the student shall be returned to the educational placement from which he or she was removed. §§ 1415(k)(1)(E)(i), 1415(k)(1)(F)(iii).

Id. at 945-46.

Here, the hearings officer concluded that Plaintiffs did not show that Defendant "failed to conduct an appropriate manifestation determination, or that the manifestation determination team lacked people knowledgeable of Student's psychological condition." Admin. Decision at 13. The officer noted that "[t]he manifestation determination team used a worksheet to consider whether Student's IEP services, strategies, and placement were appropriate; and whether Student's disability impacted Student's ability to understand the consequences of Student's misconduct, and control the misconduct." Id. The officer further noted that school psychologist Leslie Kunimura, who was part of the team, "opined that Student's conduct in lighting off the bomb was not a manifestation of his diagnosis of ADHD, inattentive type"; and that behavioral health specialist Jackson "testified that Student is able to appreciate the consequences of his actions, even though he has been diagnosed with ADHD, inattentive type, and he is impulsive." Id. The officer agreed that "[t]he facts surrounding the explosion show that Student's admitted act of lighting the fuse was not an impulsive act which Student could not control." Id. Plaintiffs challenge the manifestation determination review on several

grounds, and the Court addresses Plaintiffs' arguments in roughly the order presented in their briefs.[19/]

First, Plaintiffs claim that the manifestation determination team was aware that Student "took the blame for the May 2010 incident in order to get paid," but "failed to analyze [or] consider whether this confession was related to his disability, for example, his propensity for impulsivity." Opening Br. at 31-32. The Court rejects this argument, which Plaintiffs repeat several times, as an improper attempt to resurrect the question whether Student actually set off the firework. See Opening Br. at 4-5, 33; Reply at 17-19. It is not the Court's role to determine whether Student falsely confessed to setting off the firework, and neither was it the role of the hearings officer or of the manifestation determination team. Instead, the manifestation team was required by the IDEA to determine whether the actions leading to Student's potential suspension – as determined by Defendant's investigation – were a

_____

[19/] The hearings officer did not specifically address Student's Conduct Disorder in discussing the propriety of Defendant's manifestation determination review. The officer did, however, find that "Student's conduct disorder affected his behaviors." See Admin. Decision at 3. The Court notes that when asked whether there were "any discussions about conduct disorder at the manifestation determination," Jackson responded, "I believe it was raised, and I can't remember the substance of why it was rejected. I think we discussed it, but conduct disorder was not the category he was certified for under Special Education." Tr. at 303; see also Tr. at 301-03, 349-50; supra Note 3.

manifestation of an eligible disability or of Defendant's failure to implement the April IEP.

In particular, the IDEA requires that "within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct," a manifestation determination team must determine "(I) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or (II) if the conduct in question was the direct result of the local educational agency's failure to implement the IEP." 20 U.S.C. § 1415(k)(1)(E)(i) (emphasis added). Here, Student faced a disciplinary change in placement because Defendant had found that Student set off a firework. Accordingly, for purposes of the manifestation determination review, setting of the firework was "the conduct in question." Plaintiffs cite no authority, and the Court has found none, to suggest that a manifestation determination team must review the merits of a school's findings as to how a student violated the code of student conduct. Such a requirement would essentially deputize manifestation determination teams, and in turn, administrative hearings officers and federal courts, as appellate deans of students. This would be inconsistent with Congress's intent in streamlining the IDEA in 2004. See H. Rep. No. 108-77, at 143-45 ("One of the explicit goals of the discipline improvements within the bill is

to ensure classroom safety. The Committee often hears from classroom teachers and school principals that Federal law ties their hands in responding quickly and effectively to very serious student behavior problems and effective management of their classrooms."); cf. Fitzgerald, 556 F. Supp. 2d at 551, 556-57 ("[T]he IDEA is designed to ensure parental participation in decisions regarding their disabled child, but it does not ordinarily require parental consent such that parents may usurp or otherwise hinder [a local educational agency's] authority to educate and discipline disabled children.").[20]

---

[20] If Plaintiffs wished to challenge Defendant's finding that Student set off the firework, they should have followed Defendant's typical procedures for contesting findings of student misconduct. Again, the IDEA was not intended to provide disabled students an additional avenue with which to challenge a school's underlying findings of misconduct. Notably, in amending the IDEA in 2004, Congress sought to remedy "the confusing manifestation determination process" that "ha[d] become an inherently subjective process that [was] purposefully used to avoid discipline for a child with a disability." See H. Rep. No. 108-77, at 143.

The Court is thus unpersuaded by Plaintiffs' claims that the manifestation determination team "did not allow for meaningful input from [Mother] that [Student] did not set off the bomb and was only taking responsibility for it with the expectation that he would be paid by those who were responsible." Opening Br. at 36; see also Reply at 15-16.

The Court is also unpersuaded by Plaintiffs' argument at the hearing that Bisho should not have led the manifestation determination meeting because he was the one who investigated the firework incident. The Court agrees with Defendant that it made sense for Bisho to lead the meeting since he was the vice principal as well as the school official most familiar with the incident.

Accordingly, the manifestation determination team did not violate the IDEA in accepting the Defendant's finding that Student set off the firework without independently reviewing the accuracy of that finding. In any event, even if the manifestation determination team should have reviewed Defendant's finding of misconduct, its failure to do so does not warrant reversing the hearings officer. Defendant's initial determination that Student set off the firework at Castle is substantiated by the record.

To begin with, Plaintiffs distort the record in claiming that "the team knew" that Student falsely confessed. See Opening Br. at 31-32; Reply at 18. Mother and Student indeed contended at the manifestation determination meeting that Student had not actually set off the firework, but only took the blame in order to get money from the true perpetrators. See Tr. at 96-98, 100-01, 169-70, 289-91; Admin. R. Resp't's Ex. 17 at DK 140-41. But the team did not "know" that Student falsely confessed. Plaintiffs suggest that the manifestation determination team knew Student "was taking the rap" based on notes from the meeting that stated "I know he didn't do it" and "he took the action thinking he was going to get paid for it." See Opening Br. at 31 (citing Tr. at 169-70); Admin. R. Resp't's Ex. 17 at DK 140. But as Castle vice principal Bisho clarified, those notes reflected only what Mother had stated at the meeting. See Tr. at 289-91.

Indeed, Bisho and behavioral health specialist Jackson testified that they believed Student had set off the firework as he admitted doing.  <u>See</u> Tr. at 262-63, 267, 301.

Further, Bisho testified at length about the investigation leading to his determination that Student set off the firework.  <u>See</u> Tr. at 238-44, 266-79, 289-90.  The Court agrees with Defendant that there was sufficient evidence to support that determination.  Although Plaintiffs appear to suggest that Defendant had to prove Student guilty beyond a reasonable doubt, the Court is not convinced.  Also, Plaintiffs rely heavily on Student's testimony "that he fabricated the story [of his lighting the firework] to Vice-Principal Chris Bisho in order to receive the remuneration."  <u>See</u> Opening Br. at 5.  But as the hearings officer concluded, "Student's inconsistencies show that either he was not telling the truth to the vice-principal when he admitted to setting off the bomb or not telling the truth when testifying under oath at the hearing. Either way, Student's credibility is at issue, and the believability of his testimony is diminished."  Admin. Decision at 6.  The Court will not second-guess this credibility finding, and thus gives Student's testimony limited weight.  <u>See</u> <u>Amanda J.</u> <u>v. Clark County Sch. Dist.</u>, 267 F.3d 877, 889 (9th Cir. 2001). Finally, the Court notes Bisho's testimony that "on the same day when [he] was interviewing" Student, Student called Mother and

said "'Mom, don't worry about it, I did it for the money.' And when [Student] got off the phone and hung up, [Bisho] said, 'Danny, did you not do it or did you do it?' [Student] goes, 'I just told my mom that so she'll get off my case.'" Tr. at 290.

Second, Plaintiffs argue that the manifestation determination team failed to adequately review the April IEP in determining that it was appropriate. See Opening Br. at 32-33, 35-36; Reply at 16. Plaintiffs contend that if the team had reviewed the April IEP, it would have found that IEP deficient. See Opening Br. at 33; Reply at 19. The Court is not convinced. The record shows that the manifestation determination team, including Mother, unanimously agreed after discussion that Student's IEP and placement were appropriate and that the IEP was being implemented properly. See Tr. at 248, 287-89, 292-95, 322-23; Admin. R. Resp't's Ex. 17 at DK 139-41, 45. And according to the meeting notes, Mother questioned whether the IEP was being implemented properly, and members of the team "explained"; "showed [Mother] IEP services and supplementary services and explained"; and Jackson "provided group w/IEP." Admin. R. Resp't's Ex. 17 at DK 140. This review satisfied the IDEA's requirements. See Fitzgerald, 556 F. Supp. 2d at 559 ("All the statute requires is that, before reaching a manifestation determination, the team must review the information pertinent to that decision, including the child's IEP, his teachers' comments,

and any information provided by the parents.  And this review
clearly may occur before or during the course of [a manifestation
determination] hearing.").[21]

Third, Plaintiffs argue that the manifestation
determination team improperly failed to consider the emotional
behavioral assessment.  <u>See</u> Opening Br. at 31-32, 36-37; Reply at
16, 19.  The Court is not persuaded.  Assuming that this
assessment was in Student's file, Plaintiffs have not shown, by a
preponderance of the evidence, that the manifestation
determination team did not review this information before or
during the hearing.  <u>See</u> 20 U.S.C. § 1415(k)(1)(E)(i) (providing
that the manifestation determination team "shall review all
relevant information in the student's file, including the child's
IEP, any teacher observations, and any relevant information
provided by the parents"); <u>Fitzgerald</u>, 556 F. Supp. 2d at 558-59.
Plaintiffs' <u>only</u> evidence that the manifestation determination
team failed to review the emotional behavioral assessment is that
Bisho did not recall on cross-examination whether the assessment
was introduced at the meeting.  <u>See</u> Opening Br. at 32 (citing Tr.
at 280).  Moreover, prior to the meeting, Bisho had read the
assessment (as Plaintiffs acknowledge), Mother presumably had
read it, and Jackson had attended a March 2010 meeting where the

---

[21] Moreover, for the reasons discussed <u>supra</u> Part II, the
Court is unpersuaded by Plaintiffs' contention that the April IEP
was inappropriate.

assessment was thoroughly explained. See Tr. at 279-85, 308;

Opening Br. at 31.[22/] It is also likely that Kunimura had

reviewed the emotional behavioral assessment or had been familiar

with its contents. Kunimura testified that although she did not

know Student personally, she "kn[ew] of [him] through

consultation with colleagues" who had written the emotional

behavioral assessment. See Tr. at 348-50; Admin. R. Resp't's Ex.

13 at DK 86.

In any event, even if Defendant violated the IDEA's

procedures in failing to ensure that each member of the

manifestation determination team reviewed the emotional

behavioral assessment, Plaintiffs have not shown that this

ultimately denied Student a FAPE. See Amanda J., 267 F.3d at 889

("Not every procedural violation . . . is sufficient to support a

finding that the child in question was denied a FAPE. Technical

deviations, for example, 'will not render an IEP invalid.'"

(citation omitted)). In particular, Plaintiffs offer no

persuasive evidence that the manifestation team would have

reached a different conclusion had each member thoroughly

reviewed the emotional behavioral assessment. See Fitzgerald,

556 F. Supp. 2d at 559 (concluding that a school board's

---

[22/] It is unclear from the record whether other members of
the manifestation determination team also attended the March 2010
Student Support Team meeting where the emotional behavioral
assessment was reviewed.

manifestation determination review did not violate the IDEA where the plaintiffs "set forth no reason why they believe the outcome of Kevin's MDR may have been different if the 2005 IEP had also been reviewed"); Farrin v. Maine School Admin. Dist. No. 59, 165 F. Supp. 2d 37, 51-52 (D. Me. 2001) (concluding that a manifestation determination team's failure to review relevant test results was harmless).

As the hearings officer concluded, the record supports the manifestation determination team's finding "that Student's conduct in lighting the bomb was not a manifestation of his diagnosis of ADHD, inattentive type." See Admin. Decision at 13. In particular, Leslie Kunimura, the school psychologist who explained Student's diagnosis to the manifestation determination team, testified that:

> [Student's] conduct was not a manifestation of his diagnosis of the ADHD inattentive type because the act of setting an explosive off at school is a planned activity. It requires sustained attention. It requires follow through with directions. So students with ADHD, inattentive type, they have difficulty organizing tasks and following through with directions because they are easily distracted, and they tend to overlook the details of the task.

Tr. at 348-52; see also Admin. R. Resp't's Ex. 17 at DK 140. Bisho and Jackson also testified about why they concluded Student's conduct was not a manifestation of his disability. See Tr. at 277-86, 300-03; Admin. Decision at 8 (noting that Jackson "testified that Student is able to appreciate the consequences of

his actions, even though he has been diagnosed with ADHD, inattentive type, and he is impulsive").

Moreover, if Student's conduct was not simply an unrelated wrongful intentional act on his part, the Court agrees with Defendant that Student's conduct probably resulted from his Conduct Disorder. Cf. Answering Br. at 21-22. The hearings officer specifically found that "Student's conduct disorder affected his behaviors." See Admin. Decision at 3. And according to the emotional behavioral assessment, Student's "breaking of multiple school rules" and "defiance of authority figures" are "behaviors that are frequently associated with Conduct Disorder." Admin. R. Resp't's Ex. 13 at DK 107, 110. Also demonstrative of Conduct Disorder, Student "has deliberately destroyed the property of others; has broken into someone else's building; often lies to avoid obligations; and has stolen items of nontrivial value without confronting a victim (i.e., shoplifting)." Id.

In sum, the Court finds that Plaintiffs have not shown that Defendant failed to conduct an appropriate manifestation determination review.

## CONCLUSION

For the foregoing reasons, the Court AFFIRMS the Findings of Fact, Conclusions of Law, and Decision of the State of Hawaii's Office of Administrative Hearings.

IT IS SO ORDERED.

Dated:  Honolulu, Hawai'i, September 27, 2011.



_____
Alan C. Kay
Sr. United States District Judge


<u>Danny K., by and through his mother, Luana K. v. Department of Education,</u>
<u>State of Hawai'i</u>, Civ. No. 11-00025 ACK-KSC, Order Affirming the Findings of
Fact, Conclusions of Law, and Decision of the Office of Administrative
Hearings.